No. 38,075

SHERMAN LAWRENCE, *Appellee,* v. THE KANSAS POWER AND LIGHT COMPANY, and H. H. BRUNER, *Appellants.*

(224 P. 2d 1007)

Opinion filed December 9, 1950.

*Philip E. Buzick,* of Topeka, argued the cause, and *Clayton E. Kline, M. F. Cosgrove, Balfour S. Jeffrey* and *Robert E. Russell,* all of Topeka, were with him on the briefs for the appellants.

*F. J. Rost,* of Topeka, argued the cause, and *G. Clay Baker* and *Harold E. Doherty,* both of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, J.: Sherman Lawrence, forty-four years of age, was injured on October 8, 1947, when an automobile in which he was riding as a passenger collided with a bus belonging to the defendant, the Kansas Power and Light Co., at the intersection of Sumner street and Pennsylvania avenue in the city of Topeka. At the time of the collision the bus was being driven by the defendant, H. H. Bruner, an employee of the company. Following the accident the plaintiff brought suit against the defendants charging they were guilty of certain acts of negligence in the operation of the bus, alleging that he had suffered certain injuries (describing them) as the result of the collision, and asking for damages in the amount of $20,000.

The case has been tried in district court on three different occasions. At the first trial the district court sustained a demurrer to the plaintiff's evidence. On appeal (See *Lawrence v. Kansas Power & Light Co.,* 167 Kan. 45, 204 P. 2d 752) that judgment was reversed by this court with directions to grant a new trial. The second trial resulted in a verdict of $7,873.40 for plaintiff. After its rendition the defendants made application for and were granted a new trial. The third trial, the one here involved, was had before a jury which returned a verdict in favor of the plaintiff and against the defend-

ants in the amount of $4,000. After overruling the defendants' motion for a new trial this verdict was approved by the trial court and judgment was rendered thereon in favor of the plaintiff. Defendants then perfected this appeal in which the only error relied on as a ground for reversal of the judgment is that the trial court erred in overruling their motion for a new trial because the verdict of the jury was excessive and rendered under the influence of passion and prejudice.

In view of the issue involved no useful purpose would be served by a further and more detailed statement of the facts giving rise to this controversy. However, in case a more complete statement is desired for informative purposes, it should be said they are set forth at length and can be found in the opinion of *Lawrence v. Kansas Power & Light Co.,* supra. For the same reason, nothing is to be gained by burdening this opinion with references to any testimony adduced at the trial except that relating to the extent and character of the injuries suffered by appellee as a result of the collision. We therefore turn directly to the evidence decisive of that point.

The appellee testified as a witness in his own behalf. The substance of his testimony will be summarized and related as briefly as possible. He stated that on the date of the accident he was working at common labor for Allen Taylor, a contractor, at $1.10 an hour, that following the accident he became unconscious and awakened in a hospital the next day, that he suffered severe pain in his back, groin and penis, that he bled profusely, that several ribs were broken, that both pelvis were broken, that he remained in the hospital for twenty-seven days and that for eighteen or nineteen days of that time he was flat on his back in bed, unable to turn over, with a catheter inserted through his penis to his bladder. With reference to his condition and what happened after he left the hospital he stated he went to his home and was confined to his bed during practically all of the succeeding two or three weeks, that he used crutches for three or four months after he got out of bed and then a cane, that he returned to work on March 20, 1948, for his former employer, that at that time he was unable to do the work he had performed prior to the accident—pushing a wheelbarrow—and started operating the cement mixer. Touching his condition at the time of the trial he said that he could not lift heavy weights as he had in the past and that when he attempted to do so his back hurt and he became tired; that when he

walked very far and fast he had a peculiar pain that ran up and down his legs from the hips and that his back gave out, and that he had difficulty in passing his water. Testifying further with respect to his condition he stated that prior to the accident he was normal sexually and that since that time had become impotent. He also stated that because of the accident he had incurred hospital and medical bills amounting to $418.

Allen Taylor testified that immediately prior to the accident appellee was working for him pushing a wheelbarrow, shoveling sand, and doing other heavy work; that he was paying him from $50 to $60 a week on the average; that when appellee returned to work on March 20, 1948, he paid him at the same rate, although he gave him light work, consisting of running the cement mixer, where he could operate the machine with his hands and lean against the cement on the mixer.

Testimony of the attending physician was to the effect that his examination of appellee on the evening of the accident showed fractures on both sides of the pelvis, fractured ribs on the left side of the chest, a rupture of the urethra and a urinary retention necessitating insertion of a catheter which remained in for several days. He also stated that appellee suffered a great deal of pain while in the hospital. This witness also testified that his examination of appellee on the day of the trial showed some limitation of motion in his back and that he needed further treatment for that condition as well as the condition of his ruptured urethra which, if not relieved, might result in a permanent stricture. He also said that in his opinion appellee's back was not as strong as it was before the accident and that in his present condition he could not perform heavy manual labor. When asked as to what the expense of necessary treatment to appellee's back would amount to the doctor refused to give an estimate, stating that it would require diathermy treatments two or three times a week for four or five months. He did estimate the expense of repairing the ruptured urethra at from $100 to $200.

During the cross-examination of the witness last mentioned appellants subjected him to a rigid cross-examination for the obvious purpose of having him admit that additional treatment would result in appellee's complete recovery. While it must be conceded that his answers to some of the questions on that subject indicated he was hopeful such would be the result, a fair analysis of his testimony indicates that he was by no means sure of it. This is definitely established by the following excerpts from portions of his testimony:

"Q. Did you have an opinion at that time as to whether or not he would have any permanent disability from his injuries? A. I didn't; no. It is difficult to say how a person is going to be six months later, and I maintained a hopeful attitude, as with many patients, that he would get better.

"Q. Well, based upon the experience that he had so far as recovery, is concerned, didn't you have some opinion as to how he would get along? A. My expressed opinion was he'd get along all right, my retained opinion was that he would have difficulty.

"Now doctor, if he has this additional treatment which you say he needs, particularly with reference to his urinary tract, when that treatment is completed, will that remove this stricture which he now has? A. It might, it would depend upon the type of stricture. However, if an operation was necessary to remove the stricture it might require much greater treatment than I indicated.

"Q. Doctor if that treatment is followed, do you have an opinion as to whether or not at the end of it he will be back to normal again. In other words, isn't this treatment going to do some good that you are talking about? A. I think it would. There again I wouldn't say definitely, but I think it would."

Another physician, an orthopedist, testified concerning examinations he had made of appellee in June, 1949, and again just before the trial. He stated appellee still had a lumbosacral strain requiring further treatment, the expense of which would amount to from $300 to $350, that because of such strain his back was not as good as before the accident, and that in his present condition he could not perform heavy work. In response to questions by appellants' counsel this witness conceded that if appellee would take the treatment, to which he had referred, he believed that he would be all right as far as his back was concerned. However, the record discloses that he, like the attending physician, was not too certain that would be the result. This is evidenced by portions of his testimony on such point hereinafter quoted:

"Q. And it was your opinion then and it is your opinion now that if he would take that treatment he would be all right? A. That is right.

"Q. Do you believe that if this man took this treatment, doctor, that you recommended, that he would thereafter have any permanent disability whatsoever? A. Well, one cannot guarantee; the longer one delays in getting treatment of these lumbosacral strains, the less likely you can be sure of a permanent result. However, I still feel that he should get a good result.

"Q. But you believe that in all probability he would have very little, if any, permanent disability after that treatment? A. I believe he should get a good result."

So far as the record discloses the only testimony adduced by appellants relating to the phase of the issue in controversy was that of Dr. Clovis Bowen, a general practitioner in the city of Topeka, who

said that he had examined appellee in October, 1948, before he went to work as a laborer for the Hill Packing Company. This witness states this examination was general in nature and of the kind usually made to determine the fitness of employees for work with the company and that it did not include the injuries to appellee's back or the rupture of his urethra. On cross-examination he frankly conceded that if appellee had made complaint of a ruptured urethra, a fractured pelvis and a strained back, he probably would not have let him go to work for his company.

The rule established in this jurisdiction is that in order for a verdict and judgment in a personal injury accident to be set aside or reduced as excessive it must appear, from all the facts and circumstances disclosed by the record, they are so large as to shock the conscience of the court (See *Henderson v. Deckert,* 160 Kan. 386, 162 P. 2d 88, and cases there cited).

When we give full credence to appellee's testimony touching the extent of his injuries, his pain and suffering, his expenses, and other matters relating to his present physical condition to which there is no need to again refer, and to all the other evidence herein mentioned, as we are bound to do because the jury gave it such credence, we cannot say that the verdict and judgment in the instant case are so excessive as to shock our judicial conscience. Therefore, under the rule to which we have heretofore referred, the record does not warrant either an order of remittitur or a reversal of the judgment.

The conclusion just announced means, of course, the size of the verdict itself was not so excessive as to indicate bias or prejudice on the part of the jury. We find nothing in the record to indicate it was guilty of conduct of that character in any other respect. It follows appellants' assignment of error to the effect the verdict was given under the influence of bias and prejudice cannot be upheld.

The judgment is affirmed.